**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**


| | | |
|---|---|---|
| **REBEKAH CARDENAS-MEADE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:09-CV-268** |
| | ) | **(Phillips/Shirley)** |
| **PFIZER, INC.,** | ) | |
| **Defendant.** | ) | |


## MEMORANDUM OPINION


Plaintiff, Rebekah Cardenas-Meade, has brought this action against her

former employer, Pfizer, Inc., alleging violation of the Family Medical Leave Act (FMLA);

violation of the Americans With Disabilities Act (ADA) and the Tennessee Disability Act

(TDA); discrimination under Title VII and the Tennessee Human Rights Act (THRA); and

retaliation under the Tennessee common law.  This matter is before the court on the

defendant's motion for summary judgment.  For the reasons which follow, the defendant's

motion will be granted and this action dismissed.


## I.  Background

Defendant Pfizer is a research-based pharmaceutical company engaged in

the discovery, development, manufacture and sale of prescription medications.  The sale

of Pfizer's products is accomplished through sales representatives who are located

throughout the United States and who call on physicians, hospitals and other healthcare

providers to explain the benefits of Pfizer's pharmaceutical products in order to generate sales of prescription medications.

In January 2006, plaintiff was hired by defendant for a sales representative position in Knoxville, Tennessee. Her job consisted of driving to local physicians' offices and selling Pfizer products to them. She did not have an office to report to but worked out of her home. As a field representative, plaintiff only saw her district manager once a month, if that often, for monthly "field rides" or coaching sessions. From January 2006 through September 2007, plaintiff consistently exceeded her quota in sales. She was ranked in the top five sales representatives in the region. She received several awards for her sales performance.

Pfizer has a mandatory six-phase training program for representatives that spans the first eighteen to twenty months of employment. The training program culminates in a three-day evaluation known as Phase VI training. Phase VI consists of a standardized computer test, a sales presentation and a territory analysis. The Phase VI evaluators are a regional manager, an assistant regional manager and one guest district manager from within the region. The evaluators score each candidate separately. The scores are then averaged and combined with the candidate's score on the standardized computer test. The overall score determines whether the candidate passes Phase VI training. Unsuccessful candidates are placed on a final probation and given a second opportunity to pass Phase VI or face termination.

Plaintiff was originally scheduled for Phase VI training in August 2007. At the time, plaintiff told her district manager, Bo Shealy, that she was having personal problems in her marriage and with finding childcare for her young daughter. Plaintiff was the sole breadwinner in her family as her husband is disabled. She told Shealy that she felt unprepared for Phase VI because she had not had an opportunity to do a "mock" presentation for her sales team and receive feedback from a manager. Shealy advised her that she could postpone Phase VI, and the training was rescheduled at plaintiff's request to October 2007. Four sales representatives, two men and two women, including plaintiff, participated in the October training. The evaluators were regional manager, James MacDougall; assistant regional manager, Christine Pullen; and guest district manager, Orlando Jackson. Plaintiff failed Phase VI training in October 2007 with a score of 63, below a passing score of 75. The other three participants passed.

Phase VI ended on Thursday, October 11, 2007. Plaintiff understood that because she failed Phase VI, when she returned to work, she would be placed on final probation that would give her six months to pass Phase VI or be terminated. Plaintiff never returned to work. Instead, plaintiff went out on medical leave the next day and did not work again before her termination on June 17, 2008. Plaintiff avers that she went on medical leave because of her alleged treatment by MacDougall during the Phase VI evaluation. Specifically, she testified, "I had felt ridiculed and humiliated. I felt like I had been discriminated against, and I didn't want to subject myself to any more of that treatment." Plaintiff further testified that she was treated in a demeaning and humiliating way by

3

MacDougall during Phase VI when he interrupted her, was argumentative, was not engaged, called her a liar, and said she lacked "emotional intelligence."

While she acknowledges that the other female participant passed the training class, plaintiff complains that she failed Phase VI because of gender discrimination. Plaintiff avers that the other female participant was not treated the same way:

> Jim MacDougall didn't treat Megyn Byrd like he treated me, nor did he treat the males like he treated me. He was degrading. He humiliated me. He interrupted me. The other female wasn't told to button her blouse.

Plaintiff believed the difference in treatment was related to a discussion she had with her district manager Shealy about child care:

> I had told Bo Shealy that I was having issues with child care. I disclosed that to him . . . [Shealy] did disclose to me that he would share that information with Jim MacDougall. So it is my belief that because he shared that information with Mr. MacDougall [I] was treated different than Megyn and the other two men that were there because of that.

Megyn Byrd was also married with young children. Nonetheless, plaintiff states that because of what he had been told about her personal issues, MacDougall was predisposed to believe that she would be and was unprepared for training. Plaintiff avers that evaluators Pullen and Jackson were influenced by MacDougall to give her failing scores in Phase VI. Pullen, however, testified that the failing scores she gave plaintiff were not influenced by MacDougall, and her scores reflected her independent opinion that plaintiff was unprepared for the Phase VI evaluation.

4

On January 7, 2008, plaintiff made a complaint about MacDougall's treatment of her through Pfizer's "Global Compliance Alertline," an employee reporting service. Amy Jenner, Executive Vice President of Sales in New York, and MacDougall's supervisor, contacted plaintiff regarding her complaint on January 25. During the conversation, plaintiff requested a transfer to another sales territory. She also inquired about retaking Phase VI with different evaluators. Jenner was unable to informally resolve plaintiff's complaint and forwarded the matter to Human Resources.

Plaintiff documented her concerns over Phase VI training in a letter to Pfizer dated January 24, 2008. Human Resources representative Kerry Sorvino investigated the complaint and concluded that plaintiff failed Phase VI for legitimate, nondiscriminatory reasons. Sorvino did not contact plaintiff with the results of the investigation, consistent with Pfizer practice, because plaintiff was on medical leave.

On January 29, 2008, Shealy and MacDougall completed a failing performance evaluation for plaintiff. She was rated "below expectations" because she had not passed Phase VI. Shealy testified that it was "standard" for employees who had failed Phase VI to be rated below expectations until such time as they passed Phase VI.

Plaintiff states that she was disabled by her treatment at Phase VI beginning in October 2007 because she experienced sleeplessness, depression, anxiety and inability to concentrate because of MacDougall's behavior. In December 2007, plaintiff's treating psychologist, Dr. Carrie Booher, opined that "environmental factors at her current job play

5

a significant role in her distress" so that plaintiff's return to "her previous work environment is likely to be counter-therapeutic at this time." Dr. Booher estimated that after two months of therapy, plaintiff might be able to return to her current work environment. Plaintiff testified that, in fact, the symptoms began alleviating in February 2008 and that she was feeling "a lot better" by March 2008. However, by facsimile dated March 12, 2008, plaintiff's prescribing psychologist, Dr. Jill Powell, opined that "Ms. Meade had responded well to medication but is not yet ready to return to work."

A month later on April 16, 2008, three days after plaintiff's short-term disability benefits expired, Dr. Booher submitted an Employee Return to Work Status form that stated that plaintiff could return to work on April 21, 2008 with unspecified restrictions for approximately two months. In an addendum to the Return to Work form, Dr. Booher explained that plaintiff still experienced "a great deal of anxiety" when anticipating interactions with her co-workers and managers. Dr. Booher stated, however, that plaintiff's interactions with people outside of her work environment to whom she provides professional services "do not appear impaired due to psychological problems."

By letter dated April 18, 2008, Pfizer's Regional Medical Director, Dr. Agatha Nody, responded that upon clearance to return to work, plaintiff would be returning to her current managers. Relying on Dr. Booher's statements in the Return to Work addendum, Dr. Nody observed that "it appears that your patient is still impaired from returning to her current job." Dr. Nody sought both clarification and specific restrictions from Dr. Booher. Dr. Booher confirmed on April 22 that "due to the fact that the primary triggering event for

6

these symptoms occurred in the workplace and involved, according to plaintiff, being treated in a humiliating fashion in the workplace, identifying exactly when she will be able to return to the same environment that triggered these symptoms is difficult." Nonetheless, Dr. Booher submitted a treatment plan that indicated June 2008 as the target date for plaintiff's integration into her current work environment. Dr. Booher did not specify any other restriction or accommodation that would have returned plaintiff to work for her current supervisors in April 2008. Dr. Nody responded by letter to plaintiff that she understood Dr. Booher's April 22 letter and the treatment plan listing June 2008 as a possible return to work to mean that plaintiff was not yet medically able to return to work for her current supervisors in April 2008.

Plaintiff claims that she requested three accommodations from her employer: (1) a return to work in an alternative work area (for different supervisors) under Pfizer's Transitional Return to Work program; (2) a transfer; or (3) the ability to work under two other district managers in the same territory/work area. Plaintiff acknowledges that all three accommodations requested that she return to work for different supervisors: "I could return back to work and do my same duties if I wasn't working with [Shealy] and [MacDougall]."

Dr. Nody testified that the Transitional Return to Work program permitted light duty assignments in alternate work areas where applicable but had never been used to permit an employee to temporarily work for a different supervisor. Likewise, Human Resources representative, Steve Smith, testified that during his tenure with Pfizer, he was not aware of anyone using the Return to Work program to work for another supervisor

7

unless there was a reorganization and a division had changed.  Dr. Nody did not return plaintiff to work because her doctor had not released her to return to work with her current managers or identified any other restrictions.

Defendant avers that while still a Pfizer employee, plaintiff applied for and was hired effective May 12, 2008 to work as a pharmaceutical representative for a competitor, inVentive.  Plaintiff told no one at Pfizer that she had started to work at inVentive.  She did not return the Pfizer-provided company car when she started working  for inVentive, and even continued to use the Pfizer credit card and submitted reimbursement requests to Pfizer while working for inVentive.

Based on information from another Pfizer representative, Shealy informed MacDougall that plaintiff may be working for a competitor.  MacDougall in turn informed Steve Smith in Human Resources who later told MacDougall that an investigation confirmed that plaintiff was working for a competitor.  On June 17, 2008, MacDougall and his supervisor, Vice President Amy Jenner made the decision to terminate plaintiff.  A termination letter was sent to plaintiff stating that she was terminated based on confirmation that she had been employed by inVentive since May 12, 2008.

On May 14, 2008, plaintiff filed a charge of disability and gender discrimination with the EEOC.  On June 30, 2008, plaintiff filed a second charge of discrimination with the EEOC.

## II.  Summary Judgment Standard

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The burden of showing the absence of a genuine issue of fact rests with the moving party.  *Celotex v. Catrett,* 477 U.S. 317, 323 (1986).  At this stage, the court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

However, summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of that party's case.  *Tolton v. American Biodyne, Inc.,* 48 F.3d 937, 941 (6th Cir. 1995).  "The mere existence of a scintilla of evidence to support the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

## III.  Pfizer is Entitled To Summary Judgment on Plaintiff's FMLA Claim

The FMLA entitles qualifying employees up to twelve weeks of unpaid leave in a twelve month period for a serious health condition that makes the employee unable to perform the essential functions of her job.  *Walton v. Ford Motor Co.,* 424 F.3d 481, 485 (6th Cir. 2005).  Qualifying employees who return to work within that twelve-week period are entitled to be reinstated to their same or similar position. 29 U.S.C. § 2614(a)(1).  Once the twelve-week period ends, however, employees who remain unable to work have no right

9

to job restoration. 29 C.F.R. § 825.214(b); *Edgar v. JAC Products,* 443 F.3d 501, 506 (6th Cir. 2006).

Here, plaintiff requested and was granted FMLA leave for a serious health condition in October 2007. Her twelve weeks of FMLA leave ended on January 7, 2008. Plaintiff did not seek to return to work before Spring 2008. In fact, she did not submit a request to return to work until April 2008 after her doctor opined in March that plaintiff "is not yet ready to return to work." Because plaintiff exhausted her twelve-week entitlement to FMLA leave and was not able to return to work by the time such leave was exhausted, she was not denied any substantive rights under the FMLA when defendant declined to return her to work for different supervisors in April 2008. *Edgar*, 443 F.3d at 506; *Hicks v. Leroy's Jewelers Inc.,* 225 F.3d 659 (6th Cir. 2000) (an employee who cannot return to work at the end of the approved leave is not entitled to job restoration). Accordingly, the court finds that defendant is entitled to judgment as a matter of law on plaintiff's FMLA claim.

## IV.  Pfizer is Entitled To Summary Judgment on Plaintiff's Disability Claims

The framework for analyzing a discrimination claim is similar whether asserted under the ADA, Title VII or corresponding state law.[1] To prevail on her disability discrimination claims under both federal and state law, plaintiff must establish a *prima facie*

---

[1] The Tennessee Supreme Court has determined that it will look to federal law for guidance in enforcing the state's anti-discrimination laws – the THA and the THRA. *See Barnes v. Goodyear Tire & Rubber Co.,* 48 S.W.3d 698, 705 (Tenn. 2000), *abrogated in part by Gossett v. Tractor Supply Co.,* 320 S.W.3d 777 (Tenn. 2010) (disapproving the use of the burden-shifting analysis of *McDonnell Douglas Corp v. Green,* 411 U.S. 792 (1973), at the summary judgment stage of retaliatory discharge cases). As a result, this court's analysis of either federal or Tennessee law will be the same in this case.

case that: (1) she had a disability as defined by law; (2) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) she was discriminated against solely because of her disability. *See Talley v. Family Dollar Stores of Ohio, Inc.,* 12008 U.S. App. LEXIS 19342 (6th Cir. 2008); *Thorpe v. Alber's Inc.,* 922 F.Supp. 84 (E.D.Tenn. 1996). In claims of failure to reasonably accommodate a disability, the third element is stated as (3) the employer was aware of the disability and failed to provide a reasonable and necessary accommodation for the disability. *Ford v. Shaun Frame*, 3 Fed. Appx. 316 (6th Cir. 2001).

To establish a disability under the ADA or the TDA, an individual must: (1) have a physical or mental impairment which "substantially limits" her in at least one "major life activity;" (2) have a record of such impairment; or (3) be regarded by the employer as having such an impairment. 42 U.S.C. § 12102(2). "Major life activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491 (1999).

Several federal courts have held that personality conflicts, workplace stress, and being unable to work with a particular person or persons do not rise to the level of a "disability" or inability to work for purposes of the ADA. *Fricke v. E.I. Dupont Co.,* 219 Fed. Appx. 384, 389 (6th Cir. 2007). The major life activity of working is not "substantially limited"

11

if plaintiff merely cannot work under a certain supervisor because of anxiety and stress related to his review of her job performance. *See Schneiker v. Fortis Ins. Co.,* 2000 U.S. App. LEXIS 90 (7th Cir. 2000) (plaintiff seeking removal from a supervisor "whose supervisory techniques were the known cause of the stress she experienced" was not substantially limited in a class or broad range of jobs); *Greer v. Emerson Elec. Co.,* 185 F.3d 917 (8th Cir. 1999) (even if the employee's impairments made her unable to work with her particular supervisor, "this does not mean that Greer was substantially limited in the major life activity of working"); *Seimon v. AT&T,* 113 F.3d 1175 (10th Cir. 1997) (the plaintiff's inability to work under a few supervisors was not a disability because it did "not prevent him from performing a class of jobs or a broad range of jobs"); *Gaul v. AT&T, Inc.,* 955 F.Supp. 346 (D.N.J. 1997) (when an employee "merely needed to transfer away from [his supervisor] to accommodate " his depression and stress disorders, he is not covered under the ADA).

Here, Dr. Booher confirmed that the primary triggering event for plaintiff's anxiety or depression "occurred in the workplace," and that she experienced "a great deal of anxiety when anticipating interactions with her co-workers and managers but not people outside of her work environment."  Plaintiff admits that she could return to work as a pharmaceutical representative in April 2008 so long as she was not working for either MacDougall or Shealy.  It is undisputed that plaintiff's alleged impairment lasted no more than five months. "Short-term temporary restrictions are not substantially limiting." *Roush v. Weastec, Inc.,* 96 F.3d 840, 843 (6th Cir. 1996).  Accordingly, the court finds that plaintiff was not disabled under the  ADA or the TDA.

12

Alternatively, plaintiff alleges that Pfizer regarded her as disabled when Dr. Nody did not release her to return to work in April 2008. The Supreme Court has identified two ways in which an individual can be "regarded" as having a disability: (1) an employer can be under the mistaken belief that the employee is disabled, when in fact she is not; or (2) the employee can actually have a physical impairment, and the employer is aware of it, but the employer mistakenly believes that the employee is disabled because of the impairment when in fact she is not. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999); *see also E.E.O.C v. Watkins Motor Lines, Inc.,* 463 F.3d 436, 443 (6th Cir. 2006). Here, Pfizer accepted the treating doctor's opinion that plaintiff could only return to work as a sales representative if she did not work for supervisors MacDougall and Shealy. However, plaintiff has not shown that Pfizer regarded her as unable to work in a broad class of jobs, but merely unable to work for her two supervisors. Therefore, her claim that Pfizer "regarded" her as disabled fails as a matter of law.

Plaintiff has also failed to present evidence of a causal connection between her alleged disability and her termination. Defendant asserts that plaintiff was terminated because she was working for a competitor. Once defendant articulates a nondiscriminatory reason for plaintiff's termination, under *McDonnell Douglas,* the burden of production shifts to plaintiff to show that Pfizer's stated reason for her termination was pretext. To establish pretext, plaintiff must show that defendant's reason either (1) had no basis in fact, (2) did not actually motivate the adverse action, or (3) the reason was insufficient to motivate the adverse action. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143 (2000); *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994).

13

Plaintiff must produce "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Johnson v. Kroger Co.,* 319 F.3d 858, 866 (6th Cir.2003). "The jury may not reject an employer's explanation ... unless there is a sufficient basis *in the evidence* for doing so." *Manzer,* 29 F.3d at 1083. If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous. *See Sybrandt v. Home Depot, U.S.A., Inc.,* 560 F.3d 553, 559 (6th Cir.2009) (quoting *Majewski v. Auto. Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir.2001) (noting that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect")). Moreover, an employee's own speculation, unsupported by fact, is not enough to establish pretext. *Upshaw v. Ford Motor Corp.,* 576 F.3d 576, 587 (6th Cir. 2009). Nor is "mere conjecture that the employer's explanation is a pretext for discrimination a basis for denying summary judgment." *Id.* Here, plaintiff admits that she was working for a competitor, which violated both defendant's policy and her employment agreement. There is no probative evidence in the record suggesting a discriminatory intent for her termination. Therefore, because plaintiff has failed to raise a genuine issue of material fact indicating that Pfizer's decision to terminate her was a pretext for discrimination, defendant is entitled to summary judgment on plaintiff's ADA and TDA claims.

14

Plaintiff also alleges that defendant failed to provide her a reasonable accommodation so that she could return to work in April 2008. Even assuming, *arguendo*, that she was disabled, the accommodation she requested, that she be transferred (either permanently or temporarily) to different supervisors, is not one that defendant was required to make. Although a transfer can be a reasonable accommodation under certain circumstances, in the instant case, Pfizer has produced evidence that a transfer would not be a reasonable accommodation. In each of her three requested accommodations, plaintiff requests Pfizer to transfer her to different supervisors. In *Weiler v. Household Finance Corp.*, 101 F.3d 519 (7th Cir. 1996) the plaintiff argued that she should be returned to work under a different supervisor. The court observed that the plaintiff "asks us to allow her to establish the conditions of her employment, most notably, who will supervise her. Nothing in the ADA allows this shift in responsibility." *Id.* at 524 (*citing Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 384 (2nd Cir. 1996) (failure to assign employee to work under different supervisor did not violate reasonable accommodation requirement of ADA and Rehabilitation Act); *see also EEOC Enforcement Guidance; Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act,* NO. 915.002 ("an employer does not have to provide an employee with a new supervisor as a reasonable accommodation").

District Manager Shealy testified that available positions at Pfizer are "posted" and that anyone in "good standing" is able to apply for a position. He also testified that while Pfizer had allowed other sales representatives to transfer for a variety of reasons, all the representatives who had transferred had each successfully completed Phase VI.

15

Plaintiff requested a transfer from Shealy in 2007. Shealy told plaintiff that the only way she could get a transfer was if she attended and passed Phase VI training. After she failed Phase VI, plaintiff knew that when she returned to work, she would be on probation and ineligible to apply for a transfer until she successfully passed Phase VI. There is no evidence in the record that Pfizer had transferred any sales representative because of an inability to get along with their supervisor much less authorized such a transfer for a sales representative who had not yet passed Phase VI. Because plaintiff's proposed accommodation was unreasonable, her claim for failure to accommodate fails as a matter of law.

Moreover, under Sixth Circuit law, because plaintiff claims that she was regarded as being disabled by Pfizer, the company had no duty to provide an accommodation. *Workman v. Frito-Lay, Inc.,* 165 F.3d 460, 467 (6th Cir. 1999) ("Under the third prong, 'regarded as' having a disability, the defendant correctly contends that a finding on this basis would obviate the Company's obligation to reasonable accommodate" the employee); *see also Baker v. Windsor Republic Doors*, 2011 U.S. App. LEXIS 4810 (6th Cir. Tenn. 2011). Because an alleged failure to accommodate is the basis for plaintiff's "regarded as " disability claim, that claim also fails as a matter of law.

## V.   Pfizer is Entitled To Summary Judgment on Plaintiff's Gender Discrimination Claims

Plaintiff claims that she was discriminated against on the basis of her gender when defendant refused to return her to work and when it discharged her.  To establish a *prima facie* case of discrimination under Title VII or the THRA, plaintiff must show that: (1) she is a member of a protected class; (2) she has suffered an adverse employment action; (3) she was performing her job satisfactorily; and (4) similarly-situated employees who are not members of the protected class were treated more favorably.  *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996).  Defendant argues that plaintiff cannot satisfy the fourth element with respect to her return to work claim, or the second and fourth elements with respect to her termination claims.

Plaintiff's treating psychologist, Dr. Booher, opined that plaintiff could not return to work for her current supervisors in April 2008.  Plaintiff makes no allegations, and the record does not show, that Pfizer transferred a similarly situated male employee to work for different supervisors.  Accordingly, the court finds that plaintiff's gender discrimination claim with respect to her return to work claim fails as a matter of law.

As to her termination claim, it is undisputed that plaintiff was terminated in June 2008 after Pfizer confirmed that she began working for a competitor in May 2008, in violation of Pfizer policy and her employment agreement.  Therefore, plaintiff cannot show that she was performing her job satisfactorily at the time of her termination.  In addition, plaintiff has not alleged or shown that a similarly situated male employee at Pfizer, who was

known to be working for a competitor, was not terminated. Plaintiff has not shown that Pfizer's stated reason for her termination was pretextual. Accordingly, her gender discrimination claim based on her termination fails as a matter of law.

Although not alleged in her complaint, plaintiff testified in her deposition that she was discriminated against on the basis of her gender when she failed Phase VI training in October 2007. Specifically, she claims that her regional manager, Jim McDougall, singled her out for harassment and discrimination at the training and that she failed because of her gender. However, Megyn Byrd, another woman who attended Phase VI with plaintiff successfully completed Phase VI. Nonetheless, plaintiff alleges that she was treated differently because she was a woman with child care issues and/or marital problems.

Plaintiff's subjective belief that she successfully completed the Phase VI training alone is not sufficient to establish a *prima facie* case that she was performing her job satisfactorily. A plaintiff may not substitute her own business judgment for that of the employer. *Rowan v. Lockheed Martin Energy Sys. Inc.,* 360 F.3d 544, 550 (6th Cir. 2004). Here, the three Phase VI evaluators independently rated plaintiff as failing the class. In addition, plaintiff fails to identify any class of comparators with respect to her claims of disparate treatment. Title VII prohibits "gender plus" discrimination, by which an employer discriminates, not against the class of men or women as a whole, but against a subclass of men or women so designated by their gender plus another characteristic. *See Fuller v.*

*GTE Corp./Contel Cellular*, 926 F.Supp. 653 (M.D.Tenn. 1996); *Gee-Thomas v. Cingular Wireless*, 324 F.Supp.2d 875 (M.D.Tenn. 2004).

Even in the "gender plus" analysis, plaintiff must produce evidence that similarly situated males were treated differently and that there was no adequate non-gender explanation for the different treatment. *Fuller*, 926 F.Supp. at 658 (*citing Fisher v. Vasser College*, 70 F.3d 1420 (2nd Cir. 1995) (to establish that the employer discriminated on the basis of sex plus marital status, plaintiff must show that married men were treated differently from married women). Here, plaintiff has failed to produce any evidence to show that the two men who participated in Phase VI were fathers of young children or married men and received better treatment. Moreover, the other female candidate, Megyn Byrd, was also married with young children, and there are no allegations that she was singled out for discrimination. Even if plaintiff could establish a *prima facie* case of gender discrimination, defendant has established a legitimate, nondiscriminatory reason for her failing Phase VI. The other two evaluators, Pullen and Jackson, stated that plaintiff failed to deliver a passing performance; therefore, gender is an unlikely explanation for plaintiff's failure to successfully Phase VI. Accordingly, plaintiff's gender discrimination fails as a matter of law.

## VI.   Pfizer is Entitled To Summary Judgment on Plaintiff's Retaliation Claim

Plaintiff alleges that defendant refused to return her to work and thereafter terminated her in retaliation for (1) taking FMLA leave; (2) making an internal complaint of gender discrimination; (3) complaining to the EEOC; and (4) because she allegedly had a

disability and/or requested an accommodation in violation of the FMLA, the ADA, the TDA, Title VII, the THRA and Tennessee common law. To establish a *prima facie* case of retaliation, plaintiff must show that (1) she engaged in an activity protected by the relevant statues; (2) the exercise of her rights was known by the defendant; (3) the defendant took an adverse employment action against her; and (4) a causal link exists between the protected action and the adverse employment action. *Hollins v. Atlantic Co., Inc.,* 188 f.3d 652. 661 (6th Cir. 1999). If a *prima facie* case of retaliation is established, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Plaintiff then bears the burden of showing that the proffered reason for the action was merely a pretext for illegal discrimination. *Id.*

Plaintiff engaged in protected activity under Title VII, the THRA and the Tennessee common law when she made complaints of gender discrimination, harassment and retaliation through Pfizer's employee hotline on January 7 and January 24, 2008; to MacDougall's supervisor, Amy Jenner, on January 25, 2008; to Kerry Sorvino on January 31, 2008; and when she filed charges of disability and gender discrimination with the EEOC on May 14, 2008.

Dr. Nody, Pfizer's Regional Medical Director, was responsible for evaluating whether plaintiff was cleared medically to return to work. At the time she made the decision that plaintiff was not cleared to return to work, Dr. Nody testified she was not aware that plaintiff had made an internal or external complaint of discrimination. Nor has plaintiff shown that a causal link exists between her request for leave and her return to work.

Plaintiff's doctor confirmed she was unable to return to work for her current supervisors until at least June 2008. Nor has plaintiff shown that Pfizer's stated reason for her termination, that she went to work for a competitor, was in retaliation for her complaints of discrimination. Because she cannot show any evidence of pretext, plaintiff's claims of retaliation fail as a matter of law.

## VII.  Conclusion

For the foregoing reasons, the defendant's motion for summary judgment [Doc. 12] is **GRANTED**, whereby this action is **DISMISSED** in its entirety.


ENTER:
                s/ Thomas W. Phillips
                United States District Judge